UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| TIMOTHY K., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:17 CV 199 (JMB) |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Deputy Commissioner of Operations, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### **I. Procedural History**

On June 12, 2014, plaintiff Timothy K. filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of May 15, 2014. (Tr. 158-59, 183-84). After plaintiff's applications were denied on initial consideration (Tr. 79-88, 89-98), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 112-13).

Plaintiff and counsel appeared for a hearing on July 28, 2016. (Tr. 29-78). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Joy Yoshioka, M.S. The ALJ issued a decision denying plaintiff's applications on December 13, 2016. (Tr. 11-28). The Appeals

Council denied plaintiff's request for review on September 27, 2017. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff, who was born on March 1, 1964, was 50 years old on the alleged onset date. He lived with his wife and adult son. (Tr. 35, 51). He had a general education degree. (Tr. 66). For the fifteen years before his alleged onset date, plaintiff worked as a long-distance truck driver. (Tr. 62-64, 188). In addition, he was deployed to Iraq in 2004, supplying security to convoys. (Tr. 63, 175). He received his medical care through the Department of Veterans Affairs.

Plaintiff listed his impairments as chronic obstructive pulmonary disease (COPD), back pain due to degenerative disc disease, stents, hyperlipidemia, and peripheral arterial occlusive disease. (Tr. 198). He was prescribed inhalers to treat his COPD, a clotting inhibitor, drugs to reduce his cholesterol, a muscle relaxer, and hydrocodone and prednisone to treat pain. He was also prescribed an antibiotic, cough medicine, and nicotine for smoking cessation. (Tr. 201).

In his July 2014 function report, (Tr. 226-35), plaintiff reported that he was unable to work due to pain, shortness of breath, numbness in his hands, and the effects of his pain medications. He stated that he could not ride or stand for longer than 20 minutes, walk for more than a half block, lift more than 20 pounds, reach above his head, or bend or squat. His typical day consisted of showering, dressing, watching television, walking a half block, and fixing supper. He prepared complete meals every day, spending about two hours to do so, with breaks from standing. His other chores included washing dishes and watering outdoor plants. He was able to drive and went to the grocery store once a week. He was able to manage financial accounts and pay bills. Plaintiff went fishing once a month but was no longer able to garden. He

was able to follow written and spoken instructions and had no difficulty concentrating. His social activities consisted of talking on the phone, visiting with family, and going out to dinner with his wife. Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, climbing stairs, and using his hands.

Plaintiff testified that he last worked driving an 18-wheel truck between Cape Girardeau, Missouri, and Seymour, Indiana. He stopped working in 2013 due to back pain that made it difficult for him to get in and out of the truck without help. (Tr. 39-40). He had a cervical discectomy and fusion in May 2015. His vocal cords and ability to swallow were damaged in the procedure. In addition, he found it difficult to turn his head to the left. (Tr. 47-48). Three or four times a day, he experienced a pain in his neck that he described as a pinched nerve that radiated into his arms and made him "want to scream." The episodes typically lasted five or ten minutes during which time he was unable to do anything. (Tr. 55-56). Plaintiff also had low back pain, which he identified as the biggest barrier to his returning to work. (Tr. 43). Plaintiff described the pain as a squeezing sensation in his spine. (Tr. 57). About five or six times a day, he experienced a stabbing pain in his back, following which he had to rest for 20 to 30 minutes. (Tr. 58). Occasionally, the pain radiated into his right hip and leg and caused numbness in his toes. He had physical therapy in 2014 and two injections in 2016. He was contemplating a second spinal fusion, but his doctor had told him that there was only a 50 percent chance that the surgery would be effective. (Tr. 41-43). The Percocet plaintiff took for pain occasionally made him lightheaded. (Tr. 53). During the hearing, plaintiff alternated between standing and sitting, twisting to the left when he sat. He had a cane provided to him by the VA. (Tr. 54). He testified that he was unable to get out of bed one or two days a month due to pain. (Tr. 73-74).

3

In addition to neck and back pain, plaintiff had COPD which he treated with inhalers and medication.[1] He had difficulty breathing when exposed to heat and humidity. Despite the COPD, plaintiff continued to smoke. (Tr. 44). Plaintiff also had peripheral arterial occlusive disease which caused pain in his leg when he walked. He had a stent implanted in 2013, following which he was able to walk for a mile, and sit and stand for more than an hour. At the hearing, however, plaintiff testified that the stent had begun to clog. He was scheduled to see a cardiologist. (Tr. 45-47). Finally, plaintiff had recently been diagnosed with carpal tunnel syndrome and had been fitted for splints. (Tr. 56).

Vocational expert Joy Yoshioka was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education and work experience[2] who was limited to light work, who could never climb ladders, ropes or scaffolds, and was limited to only occasionally engaging in the "remaining posturals." In addition, the individual was limited to occupations that do not require frequent verbal communication or require exposure to environmental hazards. (Tr. 66). According to Ms. Yoshioka, such an individual would not be able to perform plaintiff's past work as a truck driver. Other work would be available in the national economy, such as assembler, collator, and garment folder. (Tr. 67). Ms. Yoshioka testified that the same employment opportunities would be available if the individual also needed to use a cane to walk more than 10 feet. The assembly job would not be suitable if the individual also required the option of alternating between sitting and standing every 30 minutes and the number of available collator and garment folder jobs would be reduced by 40 percent. (Tr. 68-69). Ms. Yoshioka identified retail marker as another job that could be performed with the sit-

---

[1] Plaintiff was medically discharged from the army in November 2004 due to his COPD. (Tr. 233).

[2] Plaintiff's past work as a truck driver as performed was heavy work without skills that were transferrable to sedentary or light work. (Tr. 64-65).

4

stand option. (Tr. 69). Finally, no work in the national economy would be available to an individual who required five or six unscheduled breaks lasting 15 to 20 minutes every day or who would be absent three or four days a month due to health issues or medical appointments. (Tr. 70).

> B.  **Medical Evidence**

In this action, plaintiff argues that the ALJ improperly determined that his right vocal cord paralysis and carpal tunnel syndrome were not serious impairments. Accordingly, the Court will focus its review of the medical evidence on these conditions. First, however, the Court provides a brief summary of plaintiff's treatment for peripheral arterial occlusive disease and disorders of the cervical spine and lumbar spine.

In February 2013, shortly before the first entry in the medical record, plaintiff had a stent placed in his right femoral artery to address symptoms arising from his peripheral arterial occlusive disease. (See Tr. 696, 338, 267, 439). Following this surgery, he was supposed to take the antiplatelet drug Plavix but he did not always comply. (See Tr. 441 (Aug. 6, 2014 note stating plaintiff stopped taking Plavix three months earlier)). By March 2016, it was determined that he once again had occlusive disease that reduced his femoral pulse to "negligible" and caused severe pain in his right hip and thigh. (Tr. 695-96). In the final entry in the record, dated September 17, 2016, it was noted that plaintiff needed a femoral artery revascularization. (Tr. 904).

In March 2013, plaintiff was evaluated for complaints of pain in his neck and left elbow with tingling in both fingers. (Tr. 267-69). An MRI of the cervical spine revealed degenerative disc disease and cervical spondylosis resulting in moderate stenosis. At that time, neurosurgeon Franklin Hayward, D.O., discussed performing an anterior cervical discectomy and fusion

5

(ACDF), but noted that plaintiff had a number of risk factors which reduced the chances of success, including his smoking at the rate of one pack per day. Two years later, in March 2015, plaintiff was seen at Regional Brain & Spine for complaints of pain, numbness and tingling in his lower back, legs, neck, shoulders, and arms. (Tr. 468-77). Plaintiff was assessed with lumbar stenosis with claudication, lumbar spondylosis, cervicalgia, and cervical radiculopathy. A month later, on April 30, 2015, plaintiff's pain had worsened and he was dropping things. (Tr. 486-92). An MRI of the cervical spine showed multilevel degenerative changes, disc osteophyte complexes, collapse of disc space, and severe stenosis at C5-C6, C6-C7. (Tr. 490, 492). Neurosurgeon Kyle O. Colle, D.O., performed an ACDF and plating at C5-C6 and C6-C7 on May 22, 2015. (Tr. 492, 497-500). As is discussed further below, immediately following the surgery, plaintiff developed difficulty swallowing and hoarseness which was diagnosed as right vocal cord paralysis. In addition, healing and bone growth at the fusion site were delayed and he complained that his pain was even more severe. (See Tr. 812 (Feb. 4, 2016 note stating that "no significant bridging bone through interbody spacers); (Tr. 669 (April 2016 note from pain management clinic stating that plaintiff's neck pain is worse)).

Plaintiff complained of low back and leg pain throughout the period under consideration. In November 2013, lumbosacral x-rays revealed mild disc space narrowing, small multilevel osteophytes, and mild L5-S1 facet arthropathy. (Tr. 286). Imaging studies of the lumbar spine completed on September 10, 2014, disclosed a herniated disc at L4-L5 with mild stenosis, degenerative facet changes, slight lumbar scoliosis, and minimal spondylosis. (Tr. 421-22). In October 2015, x-rays of the lumbosacral spine showed mild spondylosis throughout the lumbar spine. (Tr. 535). An MRI completed on February 11, 2016, showed moderate spinal canal stenosis at L3-L4 and L4-L5, with mild disc bulge at L4-L5, moderate spondylosis throughout

the lumbar spine, and bilateral facet joint arthropathy. (Tr. 529-30). In June 2016, plaintiff received a lumbar epidural steroid injection but it was ineffective. (Tr. 832-33, 839). Dr. Colle recommended decompression surgery to treat plaintiff's lumbar spondylosis with radiculopathy and lumbar neural/foraminal stenosis of the connective tissue and disc. (Tr. 839).

As noted above, plaintiff developed hoarseness and difficulty swallowing following his cervical fusion procedure in May 2015. A dysphagia study in August 2015 revealed esophageal dysmotility with stasis and mild reflux in the mid esophagus. (See Tr. 584 (reporting on study)). In December 2015, otolaryngologist James E. Zellmer, M.D., diagnosed plaintiff with right true vocal cord paralysis. (Tr. 586). In January 25, 2016, specialist Melanie Townsend, M.D., noted that plaintiff was a good candidate for an injection of the right vocal cord and placed him on a waiting list for the procedure, pending the results of an MRI to ensure that surgery was not precluded by his other health conditions. (Tr. 567). On March 5, 2016, plaintiff's primary care provider James Richards, M.D., reported that plaintiff would need neck precautions during surgery and aggressive COPD treatment to recover. (Tr. 687). A pulmonary function test revealed obstructive airflow limitation and mildly reduced diffusion capacity. (Tr. 688). On April 13, 2016, plaintiff decided to defer the injection after the risks of anesthesia were explained to him. (Tr. 680). At that time, his voice was described as soft and mildly breathy but easy to understand. Id. A barium swallow test in April 2016 was normal. (Tr. 612).

Throughout the period under review, plaintiff reported symptoms consistent with carpal tunnel syndrome. (See Tr. 267 (on March 2013, plaintiff complained of six-month history of numbness/tingling in bilateral fingers)); (Tr. 226 (in July 2014 function report, plaintiff stated his hands went numb and he dropped things)). Seven months after his cervical fusion surgery, in December 2015, plaintiff was assessed with bilateral carpal tunnel syndrome after reporting that

7

he had numbness and tingling in his hands which kept him awake at night. (Id. (Tr. 794-95) (noting that similar symptoms before surgery had been thought to be due to severe central stenosis of cervical spine)). In March 2016, plaintiff displayed a positive Tinel's sign on the right side and was provided a cock-up splint for that wrist. (Tr. 820, 691). A nerve conduction study showed severe bilateral carpal tunnel syndrome. (Tr. 816, 669). Plaintiff continued to experience numbness in his fingers in April and May 2016. (Tr. 664, 825-27, 656, 635). On July 26, 2016, neurosurgeon Dr. Colle noted that plaintiff did not have "significant complaints of bilateral hand numbness" during his clinic visit. (Tr. 842). Motor functioning and sensory examinations of the upper extremities were normal. (Tr. 840).

2. Opinion evidence

On August 22, 2014, Matthew Karshner, M.D., performed a consultative examination of plaintiff. (Tr. 411-13). Plaintiff reported that he could no longer work due to low back pain that had been present for years and had worsened in the last one to two years. Dr. Karshner noted that plaintiff walked to the examination room using very short, slow steps, with a cane which he held on the wrong side. He bent forward to take off his shoes before he was weighed and then kicked his shoes down the hall to the examination room. He was able to walk on his heels and tiptoes, tandem walk, hop, squat, and return to standing from the squat position. An examination of his extremities showed normal muscle mass and tone and he had no clubbing, cyanosis or edema. He had minimally delayed capillary refill in his toes, with trace reflexes and faint but detectable pulses. Straight leg raising tests, Babinski sign and clonus test were all negative. He had no significant tenderness of the spine but displayed positive Waddell's signs which were "nonphysiologic" and were not reproducible on palpation. He had no facet or radicular signs. Examination of the hips revealed no tenderness and no abnormality or pain with full range of

motion. Dr. Karshner noted that, as he left the examination, plaintiff walked at a normal pace without limping or using his cane. Dr. Karshner's impressions were degenerative disc and joint disease of the lumbar and cervical spine, apparent history of peripheral vascular disease status post stent mildly affecting the lower extremities, and likely mild COPD. Dr. Karshner opined that plaintiff had the ability to perform sedentary to occasional light work. The ALJ found that Dr. Karshner's opinion was conclusory and inconsistent with the objective findings of the examination. The ALJ concluded plaintiff's history of treatment did not support significant limitations on his ability to stand and walk as required by a limitation to sedentary work. (Tr. 22).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th

Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining

whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since May 15, 2014, the alleged onset date. (Tr. 16). At steps two and three, the ALJ found that plaintiff had severe

11

impairments of COPD, cervical degenerative disc disease status-post fusion, and lumbar degenerative disc disease. The ALJ found that plaintiff's "previously successfully treated" peripheral arterial occlusive disease did not cause more than minimal limits on his ability to walk and stand for the purposes of work. (Tr. 17). With respect to plaintiff's post-fusion hoarseness and difficulty swallowing, the ALJ noted that a swallowing test in April 2016 was normal and that plaintiff's raspy voice was stable. Id. Finally, the ALJ noted that plaintiff did not have significant complaints of hand pain and numbness in July 2016, and determined that his carpal tunnel syndrome did not result in any specific work related limitation. (Tr. 18). The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Id.

The ALJ next determined that plaintiff had the RFC to perform light work, could occasionally lift or carry up to 20 pounds and frequently lift or carry 10 pounds. He could not climb ladders, ropes, or scaffolds, and should perform postural activities, including balancing, no more than occasionally. He had to avoid environmental extremes and workplace hazards. Finally, he was limited to occupations that do not require frequent verbal communications. Id.

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 21).

At step four, the ALJ concluded that plaintiff could not return to his past relevant work. (Tr. 23). His age on the alleged onset date placed him in the "closely approaching advanced

age" category. He had a general education diploma and was able to communicate in English. Id. The transferability of job skills was not material because using the Medical-Vocational Guidelines as a framework supported a finding that plaintiff was not disabled, regardless of whether he had transferable skills. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as an assembler, a collator, and a garment folder. (Tr. 23-24). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from May 15, 2014, the alleged onset date, through December 13, 2016, the date of the decision. (Tr. 24).

## V. Discussion

Plaintiff argues that the ALJ improperly concluded that his bilateral carpal tunnel syndrome and vocal cord paralysis were not severe impairments.

The ALJ determines whether a claimant has severe impairments at step 2 of the process. A severe impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Basic work activities include, among other things, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as various mental and physical activities. 20 C.F.R. § 416.921(b). An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby v. Astrue, 500 F.3d 705, 707–08 (8th Cir. 2007) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987); and at 158 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a)). The burden of showing a severe impairment rests with the claimant, and the burden is not great. See Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); see also Gilbert v. Apfel, 175 F.3d 602, 604-05

13

(8th Cir. 1999) (court to apply "cautious standard" at step 2 of evaluation process). Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015).

Plaintiff was first diagnosed with carpal tunnel syndrome in December 2015, but he had symptoms consistent with the condition for some time before. (Tr. 792) (noting that "[p]rior to his [cervical fusion] surgery, it was thought that [his symptoms were] related to his severe central stenosis of his cervical spine); (Tr. 267) (noting in March 2013 complaints of numbness and tingling in bilateral fingers); (Tr. 488) (noting in April 2015 that plaintiff complained of dropping things); (Tr. 755) (noting in July 2015 numbness, tingling and cramping in hands) (Tr. 573) (noting in January 2016 complaint of numbness in arms). A March 2016 nerve conduction study was interpreted as showing severe bilateral carpal tunnel syndrome and he was provided with splints. (Tr. 816, 822, 803-04, 691). The Court finds this evidence is sufficient to meet the standard for demonstrating that an impairment is "severe." See Parent v. Colvin, No. 3:14-CV-03056, 2015 WL 1564886, at *4 (W.D. Ark. Apr. 8, 2015) (finding that ALJ erred in finding carpal tunnel syndrome not severe where plaintiff complained of symptoms, had diagnosis, and wore braces); Martin v. Colvin, No. 2:13-CV-02150, 2014 WL 3368367, at *4 (W.D. Ark. July 10, 2014) ("[B]ased upon Plaintiff's medical records from the Good Samaritan Clinic, the ALJ should have included Plaintiff's carpal tunnel syndrome as a severe impairment or, at the very least, fulfilled his duty to develop the record and further investigate her claim on this issue."). In determining that plaintiff's carpal tunnel syndrome was not a severe impairment, the ALJ relied on Dr. Colle's July 2016 note that there were "[n]o significant complaints of bilateral hand numbness today." The Court finds that this single, somewhat ambiguous statement does not outweigh plaintiff's diagnosis and objective test results. The Court further finds that the error is

not harmless because the ALJ did not include any restrictions for grasping, lifting, fingering or handling in the RFC. Accordingly, this matter must be reversed and remanded.

The Court finds that the ALJ did not err in determining that plaintiff's vocal cord paralysis was not a severe impairment. A swallowing test in April 2016 was normal and plaintiff's voice was stable and easy to understand. (Tr. 612, 680). In addition, the ALJ accounted for any functional limitations arising from plaintiff's vocal cord paralysis by limiting him to jobs that do not require frequent communication.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of October, 2018.